IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

MITCHELL M. WALLACE on behalf of the
United States of America,

      Plaintiff/Relator,

vs.

PUBLIC HEALTH TRUST OF MIAMI-
DADE COUNTY d/b/a JACKSON HEALTH
SYSTEM and UNIVERSITY OF MIAMI
d/b/a MILLER SCHOOL OF MEDICINE,

      Defendants.
_____/

CASE NO.:

**FILED UNDER SEAL**
**JURY TRIAL DEMANDED**

FILED by _____ D.C.

APR 0 4 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – W.P.B.

## QUI TAM COMPLAINT

Relator, MITCHELL M. WALLACE on behalf of the United States of America, by and through his undersigned counsel, files this Qui Tam Complaint against PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY d/b/a JACKSON HEALTH SYSTEM and UNIVERSITY OF MIAMI d/b/a MILLER SCHOOL OF MEDICINE, Defendants, and alleges as follows:

1. This action arises under the False Claims Act, 31 U.S.C. §3729 et. seq.

2. Jurisdiction against the Defendants PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY d/b/a JACKSON HEALTH SYSTEM (hereinafter JACKSON) and UNIVERSITY OF MIAMI d/b/a MILLER SCHOOL OF MEDICINE (hereinafter

UNIVERSITY OF MIAMI) is premised upon 31 U.S.C. §3729 seq. the False Claims Act and 28 U.S.C. §1331, federal question.

3. Venue is correctly placed in the Southern District of the State of Florida under 31 U.S.C. §3730(h) because the Relator has the choice of Forum. Additionally, the claims set forth in this Complaint arose in this district.

4. Relator, MITCHELL M. WALLACE ("Relator"), is an individual who is a resident and a citizen of the State of the Florida and domiciled in Pembroke Pines, Broward County, Florida, specifically. The Relator is the original source with direct and independent knowledge of the substantive allegations set forth herein.

5. UNIVERSITY OF MIAMI d/b/a MILLER SCHOOL OF MEDICINE is a non-profit corporation organized under the laws of Florida.

6. PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY is a quasi-governmental agency that operates the public health system in Dade County pursuant to ordinance and Florida state law. The TRUST operates JACKSON HEALTH SYSTEM. JACKSON has multiple divisions, including Jackson Main, Holtz Children's Hospital, Jackson South and the Miami Transplant Institute.

7. At all times relevant to this action, each Defendant operated pursuant to a contract with the United States government agency, Medicare and the Department of Health & Human Services through the State of Florida, the Medicaid program, with each agency providing medical benefits to Medicare and Medicaid patients and paying those benefits to the Defendants pursuant to the Program Participation Agreements with their incorporated conditions of payment as a pre-requisite for federal and state funding.

8. Before filing this Complaint, Relator served a copy of the Complaint upon the United States of America by serving the U.S. Attorney General in Washington, D.C. and in the Southern District of Florida, together with a written Disclosure Statement.

## PREFATORY ALLEGATIONS: RELATOR'S INVESTIGATION

9. Relator is the original source of and has direct and independent knowledge of information on which any allegations herein are based.

10. On or about January 30, 2012, Relator was offered and accepted employment by Holtz Children's Hospital, a division of JACKSON. A CPA with extensive experience in the health care arena, Relator was to report directly to the Senior Vice President of Finance, Brian Dean and Danny Armstrong, the CAO of Holtz Children's Hospital. Brian Dean reports directly to JACKSON's CFO, Mark Knight. Danny Armstrong, although the CAO of Holtz, is an employee of the UNIVERSITY OF MIAMI. The employment included responsibilities that called for financial oversight of Holtz. His responsibility included preparing monthly financial statements and budgets for the fiscal years 2013-2014. His employment also included identifying and reducing hospital costs to the extent possible.

11. On or about April 14, 2013, JACKSON hired financial analyst, Tammy Cruanes, to assist Relator in compiling financial information. On or about June 2013, Brian Dean resigned and Relator was now to report directly to JACKSON's CFO, Mark Knight.

12. On or about August 30, 2013, Relator was called into the CFO Mark Knight's office and informed he was being terminated, effective in 6 to 8 weeks. Relator was requested to

train the in-coming CFO, Pedro Alfaro. Pedro Alfaro, who was at that time CFO of JACKSON, was being transferred to Holtz. Hamilton Clark became the JACKSON CFO replacing Pedro Alfaro.

13. Relator's termination was rescinded approximately September 27, and he was transferred on November 11, 2013 to become the Director of Finance for the Miami Transplant Institute (MTI). MTI is part of the JACKSON system. Relator was to report to CFO, Hamilton Clark and CAO, Alex Contreras, both with JACKSON.

14. Relator was instructed his main project at the time of the transfer was to do cost reports for MTI. The current cost report spreadsheet had 10,600 rows of information that is completed manually and represented potentially $25,000,000.00 of reimbursement for JACKSON. A cost report lists all the costs included in the patients' care. It is presented to Medicare for reimbursement. The cost report is not a "bill". From the cost report, MTI seeks reimbursement from Medicare.

15. On or about December 3, 2013, Steve Wu, MTI accountant and a JACKSON employee, presented to Relator a lab bill from UM to MTI for post-transplant lab tests performed by UM. The tests on the bill were performed in August 2013. The tests were ordered by UM physicians for MTI patients. The majority of the patients were Medicare and Medicaid. Most, if not all, of the lab tests were routine tests. As Director of Finance, Relator was to review and give initial approval to the lab bill from UM.

16. The three page bill had a summary page of total charges by UM to JACKSON of $350,000.00. The two supporting pages were detailed and listed about 50 patients, financial class (Medicare, etc.), the CPT code for the test performed and the amount charged at the UM

"case rate", not individual test rates. Relator then went to the CMS website for Medicare allowable reimbursement rates for the CPT codes. Inputting those rates for the bills, the Medicare allowable reimbursement totaled $50,000.00 as opposed to $350,000.00 at the UM "case rate".

17. Relator then reviewed the MTI general ledger for the prior eight months. Each month the lab bills from UM ranged between $250,000.00 to $390,000.00, depending on the volume. These bills are not reflected on cost reporting.

18. Relator requested a copy of any contract authorizing this "case rate" billing procedure. Steve Wu advised Relator that he was not aware of any such contract.

19. On December 16, 2013, Relator asked Maggie Dickens, the Director of Transplantation at MTI, who is an employee of UM, for any contract allowing this billing procedure. Maggie Dickens advised Relator that there was no such agreement, and that the "case rates" charged by UM to JACKSON had not changed in ten years.

20. On December 4, 2013, Relator also became aware of histology lab bills submitted by UM to JACKSON for tests performed on pre-transplant patients. In particular, Relator reviewed a bill from approximately May 2013. These lab tests were ordered by UM physicians for patients at JACKSON, primarily Medicare and Medicaid patients. The bill had a summary page with a total cost to JACKSON of $750,000. In addition, there were 50 or so pages of back-up which listed patients and the tests performed. No CPT codes were included. Relator requested by email to the UM lab department the lab codes for these services. Relator did not receive these lab codes prior to the termination of his employment.

21. On or about December 16, 2013, Relator asked Maggie Dickens at the meeting in her office about the pre-transplant histology lab bills and the high costs associated with those bills. Dickens told WALLACE that she knew of no agreement for billing at those rates.

22. On December 17, 2013, Relator contacted Aurelio Gonzales, VP of Budgeting, by phone to discuss what Relator had found out about the UM lab bills. Relator told Gonzales that he believed there was a possible compliance issue because of overbilling by UM on the lab bills to JACKSON. Gonzales agreed that there was a possible compliance issue. He told Relator to follow hospital protocol and discuss the matter with Mark Knight.

23. On December 19, 2013, Relator went to see Mark Knight in his office to discuss what Relator had found. Relator showed Knight a copy of the spreadsheet that he had compiled showing that JACKSON was paying approximately $300,000 too much per month for lab services performed by UM. Relator expressed to Knight his concern that there was a possible compliance issue, especially given the magnitude of the overbilling. Knight said he would bring the matter to the attention of Don Steigman, COO of JACKSON.

24. On December 26, 2013, Relator went to see Pedro Alfaro in Alfaro's office to ask him what he knew about possible overbilling when he had been the CFO at the main hospital, and in that position, approved the lab bills from UM to JACKSON. Alfaro told WALLACE that he had believed the bills were high, but he had been assured by UM employee Maggie Dickens that the UM bills to JACKSON were correct.

25. Between December 23rd and January 2nd, WALLACE continued to work on other assignments at the TPI. Most of the senior executives at JACKSON were on holiday vacation during this time.

26. On Monday, January 6, 2014, Mark Knight's assistant called Relator at approximately 9:30 AM to ask him to meet with Knight in his office. Relator arrived in Knight's office at 10:00 AM and was met by Knight and Roberto Campos-Marquetti, a human resources executive. Knight told Relator that the he was being terminated immediately. Relator asked why. He was told for "performance". Relator asked what performance issues existed. Knight did not answer, but walked out of his office. Campos-Marquetti then gave Relator a termination letter and severance agreement, which included a full release from Relator to JACKSON. Campos-Marquetti instructed Relator to return to his office, pack up his personal belongings, and leave the premises ASAP. Relator did so. Relator did not sign the termination agreement or release.

## COUNT I – FALSE CLAIMS ACT, 31 U.S.C. §3729-§3733 AGAINST THE UNIVERSITY OF MIAMI

27. Relator, on behalf of the United States of America, re-alleges and incorporates by references Paragraphs 1 through 26 of this Complaint as though fully set forth herein and further alleges:

28. This is a claim pursuant to the False Claims Act against the UNIVERSITY OF MIAMI for knowingly presenting or causing to be presented, false or fraudulent claims to the United States of America for services provided to Medicare and Medicaid patients. Upon information and belief, on or about at least 2006 to the present, in Miami-Dade County, Florida, the UNIVERSITY OF MIAMI arranged for laboratory tests it performed for Medicare and Medicaid transplant patients to be billed to Medicare and Medicaid by JACKSON'S MTI division. Its director at the time was Maggie Dickens, a UNIVERSITY OF MIAMI employee.

JACKSON then paid the UNIVERSITY OF MIAMI far in excess of the fair market value and Medicare allowable for those same tests JACKSON billed Medicare and Medicaid. The UNIVERSITY OF MIAMI knowingly and willfully presented or caused to be presented these false or fraudulent Medicare and Medicaid claims. It knew when it billed JACKSON the bills did not represent fair market value. The UNIVERSITY OF MIAMI is a Medicare and Medicaid provider. It had the authority to bill the government directly for these laboratory tests. It chose not to do so in an attempt to increase its income from JACKSON, an income it would never recover had it billed Medicare and Medicaid directly.

29. The UNIVERSITY OF MIAMI knowingly presented these grossly inflated claims in a scheme to kick back funds from JACKSON to the UNIVERSITY OF MIAMI using the Medicare and Medicaid billing process to justify the kick back. The parties knew that the UNIVERSITY OF MIAMI was being reimbursed Medicare and Medicaid funds from JACKSON. This was a clear attempt to increase the funds to the UNIVERSITY OF MIAMI in exchange for its continued business.

30. The UNIVERSITY OF MIAMI presented or caused to be presented claims for payment to the United States knowing such claims were false, fictitious, or fraudulent or with the intent to overpay the UNIVERSITY OF MIAMI with a conscious disregard of the fact the funds not only came from the United States government, but also, the taxpayers' of Miami-Dade County.

31. By virtue of the false, fraudulent and fictitious claims presented or caused to be presented by the UNIVERSITY OF MIAMI, the Plaintiff, United States of America by and through the Relator, is entitled to discover the diverse financial condition, prejudgment remedies

and post-judgment disgorgement, the setting aside of fraudulent transfers and interest and such other relief as this Court deems appropriate and just.

## COUNT II – FALSE CLAIMS ACT, 31 U.S.C. §3729-§3733
## AGAINST JACKSON

32. Relator, on behalf of the United States of America, re-alleges and incorporates by references Paragraphs 1 through 26 of this Complaint as though fully set forth herein and further alleges:

33. This is a claim pursuant to the False Claims Act against JACKSON for knowingly presenting or causing to be presented, false or fraudulent claims of the United States of America for services provided to Medicare and Medicaid patients. Upon information and belief, on or about at least 2006 to the present, in Miami-Dade County, Florida, JACKSON knowingly and willfully presented or caused to be presented false or fraudulent Medicare and Medicaid claims. As a condition of participation in the Medicare and Medicaid programs, JACKSON certifies its compliance with the program. JACKSON also certified its cost reports, when in fact it knew the costs reports presented were not accurate and that the cost reporting was false.

34. JACKSON presented laboratory claims to Medicare and Medicaid then, in a scheme to kick back funds to the UNIVERSITY OF MIAMI, kicked back the funds far in excess of the fair market value of the laboratory tests presented by the UNIVERSITY. Despite the fact JACKSON's executives had a fiduciary duty to protect the public fisque and comply with the conditions of participation for Medicare and Medicare; its executives deliberately chose to pay the UNIVERSITY OF MIAMI far in excess of the fair market value of the tests performed. The

scheme was to divert funds to the UNIVERSITY OF MIAMI, funds for which it was otherwise not entitled.

35. JACKSON presented or caused to be presented claims for payment to the United States knowing such claims were not performed by JACKSON and were false, fictitious, or fraudulent as they were done with the intent to falsely fund the UNIVERSITY OF MIAMI's bills thereby overpaying to the UNIVERSITY OF MIAMI using federal and taxpayer funds.

36. By virtue of the false, fraudulent and fictitious claims presented or caused to be presented by the Defendants, the Plaintiff, United States of America by through the Relator, is entitled to discover the diverse financial condition, prejudgment remedies and post-judgment disgorgement, the setting aside of fraudulent transfer and interest and such other relief as this Court deems appropriate and just.

## COUNT III – VIOLATIONS OF FLORIDA FALSE CLAIMS ACT FLORIA STATUTE SECTION 68.081 BY JACKSON and THE UNIVERSITY OF MIAMI

37. The United States of America by and through the Relator, re-alleges and re-incorporates by reference as Paragraphs 1 through 26 as though fully set forth herein and further alleges:

38. JACKSON'S funding is through income from the United States Government's medical reimbursement programs, the State distribution of those funds through the Medicaid program, private insurance, grants and Miami-Dade County taxes. JACKSON wrongfully diverted funds from the TRUST to the UNIVERSITY OF MIAMI. It wrongfully approved the UNIVERSITY'S overstated laboratory bills, bills grossly in excess of fair market value, in a blatant attempt to wrongfully divert funds from JACKSON to the UNIVERSITY OF MIAMI.

Then, JACKSON falsified its costing reports, failing to account for the UNIVERSITY payouts to the public. As a result of this scheme, the TRUST has wrongfully transmitted millions of dollars to the UNIVERSITY OF MIAMI. The UNIVERSITY OF MIAMI knowingly billed JACKSON and conspired with JACKSON to divert the funds. Both falsely represented to the State of Florida and the United States of America they were in compliance with both federal and state law.

### COUNT IV - UNJUST ENRICHMENT OF THE UNIVERSITY OF MIAMI

39. The United States of America by and through the Relator, re-alleges and re-incorporates by reference as Paragraphs 1 through 26 as though fully set forth herein and further alleges:

40. In consequence of the acts set forth in this Count, the UNIVERSITY OF MIAMI has been unjustly enriched at the expense of the United States of America, The State of Florida and Miami-Dade County tax payers. Defendant JACKSON participated in this unjust enrichment scheme to the detriment of the United States and the benefit of the UNIVERSITY OF MIAMI and the detriment of THE PUBLIC HEALTH TRUST, JACKSON. United States is entitled to the amount of Defendant, UNIVERSITY OF MIAMI's, unjust enrichment as restitution.

WHEREFORE, Plaintiff, United States of America through the Relator seeks that:

(1) with respect to Counts I – IV, that judgment be entered in favor of the Plaintiff, United States of America and the Relator, MITCHELL M. WALLACE, against THE PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY d/b/a JACKSON HEALTH SYSTEM and UNIVERSITY OF MIAMI d/b/a MILLER SCHOOL OF

*Qui Tam Complaint*
*Mitchell M. Wallace v. The Public Health Trust, et al.*
*Page 12*

MEDICINE, for treble of the United States' damages and for civil penalty as deemed appropriate and just by the Court plus interest and costs;

(2) with respect to Count IV, Plaintiff requests that judgment be entered against the Defendants for restitution of all funds by which the Defendant, UNIVERSITY OF MIAMI has been unjustly enriched;

(3) reasonable attorneys' fees and costs which the Relator incurred in connection with these proceedings;

(4) That in the event that the United States Government continues to proceed with this action, Plaintiff be awarded an amount for bringing this action in the amount of at least 15% and as much as 25% of the proceeds of the action or settlement of the claim;

(5) That a trial by jury be held on all issues so triable by right;

(6) Such other relief, both at law and at equity, which the Court deems appropriate and just.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April ___4th___, 2014, I have filed the foregoing Qui Tam Complaint with the Clerk of the U.S. District Court, Southern District of Florida, under seal.

Respectfully submitted,

Nancy La Vista, Esq., for
**CLARK, FOUNTAIN, LA VISTA, PRATHER, KEEN & LITTKY-RUBIN, LLP**
1919 N. Flagler Drive, 2nd Floor
West Palm Beach, FL 33407
PH: (561) 899-2100
Fax: (561) 832-3580
Email: nlavista@clarkfountain.com
llopez@clarkfountain.com
Florida Bar No. 855596
Co-Counsel for Plaintiff/Relator

and

James W. Beasley, Jr.
Florida Bar No. 145750
eservice@beasleylaw.net
Robert J. Hauser
Florida Bar No. 55141
hauser@beasleylaw.net
**BEASLEY HAUSER KRAMER & GALARDI, P.A.**
Flagler Center, Suite 1500
505 South Flagler Drive
West Palm Beach, Florida 33401
(561) 835-0900
(561) 835-0939 (fax)
Co-Counsel for Plaintiff/Relator